# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | CRIMINAL NO. 11-420-01 |
| **ALI CHARAF DAMACHE,**<br>a/k/a "Theblackflag" | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I. Introduction

On July 23, 2018, the defendant pled guilty to Count One of the Superseding Indictment, charging him with conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A. During his plea colloquy, the defendant admitted that he participated in a conspiracy to provide material support and resources to terrorists, knowing and intending that such material support and resources were to be used in preparation for and in carrying out a conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country.

The defendant entered his plea of guilty pursuant to an agreement under Rule 11(c)(1)(C), in which the parties agreed that the following specific sentence is the appropriate disposition of this case: 180 months of imprisonment, accompanied by a Stipulated Judicial Order of Removal pursuant to section 238(c)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1228(c)(5), together resulting in the defendant's transfer without undue delay, upon completion of the prison sentence, into immigration custody for uncontested removal from the United States. The parties further agreed that, at the time of sentencing, the government would move to dismiss Count Two, charging him with attempted identity theft to facilitate an act of

international terrorism. In addition, the guilty plea agreement provides that, if the Court does not impose the aforementioned sentence, then the defendant and the government have the right to withdraw from the plea agreement and insist that the case proceed to trial.

Damache is scheduled to be sentenced on October 30, 2018.

## II. History of this Case

The sentencing of Ali Charaf Damache will bring to a close a prosecution that has spanned more than nine years, including two criminal cases and six charging documents, four defendants and five unnamed co-conspirators, multiple coordinated international arrests and two extradition applications, and which forever changed the way law enforcement and the public perceived the use of U.S. women and children as would-be terrorists.

This prosecution began in October 2009 with the arrest on a Complaint of U.S. citizen (and E.D. Pa. resident) Colleen R. LaRose, a/k/a "JihadJane," upon her return to the United States after attempts to train with a terrorist cell in Europe had progressed more slowly than she had expected. On March 4, 2010, a grand jury indicted LaRose with conspiracy to provide material support to terrorists, among other crimes. One month later, on April 1, 2010, the grand jury issued a superseding indictment adding U.S. citizen (and Colorado resident) Jamie Paulin Ramirez as a defendant. Both charging documents described CC #2, "a resident of a Western European country," as the individual who enticed LaRose and Ramirez to travel overseas to live and train with jihadists.

On November 26, 2010, the United States issued a Complaint and Arrest Warrant against Ali Charaf Damache, followed by an indictment on July 28, 2011, identifying Damache as the aforementioned CC #2, and charging him with devising and organizing a violent-jihad

organization consisting of men and women from Europe and the United States, some of whom would travel to South Asia for explosives training and return to Europe to wage violent jihad. Later that year, on October 20, 2011, the grand jury returned a superseding indictment adding young U.S. resident Mohammad Hassan Khalid to the charged conspiracy for his role recruiting men and women to join the conspiracy, among other conduct.

     **A.     Colleen R. LaRose, a/k/a "JihadJane"**

As stated by the government in its sentencing memorandum regarding Colleen LaRose:

> In 2007, Colleen R. LaRose was a lonely and isolated woman. Her live-in boyfriend traveled much of the time, her only sibling lived halfway across the country, and she had few friends. Bored with her life, LaRose turned to the Internet for distraction and, ultimately, personal transformation. By mid-2008, she had managed to align herself with violent terrorists who valued her ability and persistence as their online predator, or "hunter." In this role, LaRose spent most of her waking hours working obsessively on her computer to identify, communicate with, recruit, and bring together violent jihadists.
>
> LaRose became well known in her new extremist community as an aggressive hard-working force, and her American background and appearance rendered her highly valuable to terrorists looking to attack Europe and the United States. In fact, LaRose earned praise and attention from terrorists in Europe and South Asia, one of whom ultimately tasked her with an assassination assignment in Sweden. LaRose proudly accepted this assignment, viewing it as an honor, and she thus underwent a second transformation from online extremist to real-world assassin. She located her target in Sweden and then traveled to Europe to [live with Ali Charaf Damache and] put her plan into action. Along the way, LaRose lied to the FBI, removed and concealed her computer hard drive, and stole her boyfriend's U.S. passport for an overseas terrorist associate who needed to travel.

In January 2014, the Court sentenced Colleen R. LaRose to 10 years of incarceration for her role in this conspiracy.

B.  **Jamie Paulin Ramirez**

As stated by the government in its sentencing memorandum regarding Jamie Paulin Ramirez:

> In 2009, Jamie Paulin Ramirez swiftly and secretly packed up her life in Colorado and moved overseas without telling family or friends, determined to marry an Algerian man living in Ireland whom she had never met. This man – named Ali Charaf Damache – was actively recruiting and organizing a group of violent jihadists to execute attacks in Europe. Damache and his associates were truly dangerous people, motivated by hate and prejudice and a desire to exact revenge on non-believers. Damache was also meticulous in his planning; he made arrangements to meet up with an Al Qaeda explosives expert in South Asia for training, and he aggressively recruited supporters online who filled specific needs of his terrorist organization.
>
> In mid-2009, Damache was searching for women who could travel freely around the West, and Americans Colleen R. LaRose and Jamie Paulin Ramirez were highly valuable recruits to him. He thus helped place LaRose with supporters when she arrived in Europe, and he encouraged Ramirez to travel to Ireland to become his wife.
>
> It was no coincidence that Ramirez connected with Damache and LaRose. Ramirez came to their attention because her online postings and correspondence revealed her support for violent jihad. And her blonde-haired, blue-eyed appearance allowed her to travel without arousing suspicion, thus making her particularly valuable to Damache. Ramirez also expressed a clear desire to travel and connect with other extremists. (When LaRose described her intended destination as "a training camp as well as a home," Ramirez responded that she would "love to go over there.") By the time Ramirez traveled to join Damache in Ireland, she knew and intended that her travel and presence overseas would provide material support to Damache's terrorist conspiracy.
>
> ….
>
> Even more shocking is the fact that Ramirez had a young son whom she brought to Ireland with her. She ripped her son away from family and friends without allowing him to say goodbye, changed his name, and handed him over to Damache for training in the ways of violent jihad. By Ramirez's own account, Damache hit her son, pinched him, intimidated him, and took him to the park for physical training that scared him. Meanwhile, Ramirez proudly videotaped her son talking with her about his desire to shoot "kuffar" [non-believers].[1]

---

1   The government played this brief video for the Court during the Ramirez sentencing.

In January 2014, the Court sentenced Jamie Paulin Ramirez to eight years of incarceration for her role in this conspiracy.

### C. Mohammad Hassan Khalid

As stated by the government in its sentencing memorandum regarding Mohammad Hassan Khalid:

> In the Summer of 2009, Mohammad Hassan Khalid was living a double life. To those around him, he appeared to be a polite and studious 15-year-old whose parents moved to the United States from Pakistan to give him a better life. However, in the anonymous world of online communications, Khalid was "Abdul Ba'aree 'Abd Al-Rahman Al-Hassan Al-Afghani Al-Junoobi W'at-Emiratee," a tireless soldier for violent jihad. In this role, Khalid worked late into the night on his computer, translating extremist online postings and organizing a terrorist cell.
>
> Despite Khalid's young age, his intelligence and eloquence earned him the respect and admiration of his online associates, thus allowing him to engage in broad and aggressive online plan-making with his terrorist contacts. He helped E.D. Pa. terrorism defendant Ali Charaf Damache recruit violent jihadists and help assemble a terrorist cell that planned to train with Al Qaeda and execute attacks in the West. He helped E.D. Pa. terrorism defendant Colleen R. LaRose destroy and hide evidence from the FBI, and raise funds to support her terrorist associates overseas. And he worked tirelessly with W.D. Pa. defendant Emerson Begolly and W.D. Mi. defendant Reed Stanley Berry, translating violent jihad videos from Urdu to English and posting them online in order to incite others to violent jihad.
>
> For more than two years, the defendant was consumed by a desire to support violent jihad. Not even a series of visits from the FBI deterred him. To the contrary, Khalid simply obtained a new computer, hacked into a third party's internet connection, and started up his activity once again. Further, when Khalid learned that he had been referenced as an unindicted coconspirator in the U.S. v. LaRose indictment (E.D. Pa. Criminal No. 10-123), he boasted about it to strengthen his bona fides among his online associates.

In April 2014, the Court sentenced Mohammad Hassan Khalid to five years of incarceration for his role in this conspiracy.

### D. Ali Charaf Damache

The above three defendants all cooperated with the government against Ali Charaf Damache. It was Damache who enticed LaRose and Ramirez to travel to Ireland to train with him. It was Damache who expressed a willingness to die in order to keep LaRose safe on her terrorist mission. It was Damache who trained Ramirez's young son in the ways of violent jihad. It was Damache who directed the recruiting efforts by Khalid. It was Damache who coordinated explosives training for his conspirators with a "brother[] of AQ [Al Qaeda]." And it was Damache who bragged that he was structuring his organization so that it divided into a planning team, a research team, an action team, a recruitment team, and a finance team.

Damache and the United States ultimately signed a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), agreeing that the following specific sentence is the appropriate disposition of this case: 180 months of imprisonment, accompanied by a Stipulated Judicial Order of Removal pursuant to section 238(c)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1228(c)(5), together resulting in the defendant's transfer without undue delay, upon completion of the prison sentence, into immigration custody for uncontested removal from the United States. As explained below, this sentence would be an appropriate resolution of this case as it recognizes the extreme seriousness of Damache's conduct, his role in this offense, his comparative culpability, his background, and the interest of the United States in permanently barring his reentry into this country.

### III. Sentencing Calculation

#### A. Statutory Maximum Sentence

The Court may impose the following maximum sentence: 15 years imprisonment, a lifetime of supervised release[2], a $250,000 fine, and a $100 special assessment. In addition, the defendant is not a citizen of the United States, and deportation or removal from the United States will be ordered as a result of conviction in this case. Finally, the defendant's supervised release may be revoked if its terms and conditions are violated, in which case the original term of imprisonment may be increased by up to 2 years.

#### B. Sentencing Guidelines Calculation

The government agrees with Probation that the following Sentencing Guidelines calculation applies to Damache:

| | | |
|---|---|---|
| Base Offense Level | § 2M5.3 | 26 |
| Offense involved provision of material support or resources with intent or knowledge that they were to be used to assist in a violent act. | § 2M5.3(b) | +2 |
| Offense was felony intended to promote federal crime of terrorism | § 3A1.4 | +12 |
| Defendant was an organizer or leader of criminal activity involving 5 or more participants | § 3B1.1(a) | +4 |
| Acceptance of Responsibility | § 3E1.1 | -3 |
| **TOTAL OFFENSE LEVEL** | | **41** |

---

[2] The parties' Guilty Plea Agreement erroneously states that Damache is facing a maximum of three years of supervised release. Although the length of Damache's supervised release sentence will likely be mooted by his removal from this country, the government stands by the plea agreement and seeks a three-year period of supervised release.

-7-

| Offense was felony intended to promote federal crime of terrorism | § 3A1.4(b) | Category VI |

With an offense level of 41, and a Criminal History Category of VI, Damache faces an advisory sentencing range of 360 – life. However, because Damache's statutory maximum sentence is capped at 15 years, his guideline range becomes 15 years, or **180 months of incarceration.**

### IV. A 15-Year Sentence of Incarceration Followed by Removal is the Appropriate Disposition of this Case

The parties have agreed that a 15-year sentence of incarceration – the statutory maximum – accompanied by a Stipulated Judicial Order of Removal is the appropriate disposition of this case. Without a doubt, Damache's offense conduct was gravely serious. His criminal activities presented a very real danger to Westerners everywhere targeted by the terrorist cell he was forming. Motivated by hate and prejudice, Damache identified violent jihadists online and attempted to bring them together to train and execute terrorist attacks throughout the West. He succeeded in bringing two American women and one juvenile American male to Ireland, and he actually began training the young male. He made arrangements to receive a U.S. passport stolen by LaRose for a terrorist "brother" who needed to travel, all while she plotted and traveled to kill a Swedish resident in furtherance of the extremist cause.

This plot was cut short not because these conspirators had second thoughts, but rather because LaRose ultimately grew frustrated that her co-conspirators were not ready for action and decided to return to the United States, where she was arrested. Nonetheless, the aftermath of these crimes continue to this day. The stolen passport remains missing, and the life

of the intended victim of the murder plot outlined in the superseding indictment has been forever changed. In an interview with U.S. law enforcement, the target of the murder plot explained that it seemed to ignite other like-minded people. Several of his speaking engagements have been canceled by the sponsors for security reasons. In addition, he was attacked during a lecture in May 2010, and someone attempted arson at his home later that same year. He has learned to be far more careful about his personal security at home and while traveling, and he expressed sadness that those with whom he spends his time have become more fearful as well.

A 15-year sentence would not only recognize the seriousness of Damache's conduct, but it would also recognize his comparative culpability to his co-conspirators. Damache was the individual responsible for recruiting and organizing and leading their terrorist conspiracy, and his sentence should reflect this leadership role. In addition, the three co-conspirators all received Motions for Downward Departure due to their cooperation against Damache, resulting in sentences of 10 years (LaRose), 8 years (Ramirez), and 5 years (Khalid).

A 15-year sentence would also recognize the fact that this is not Damache's first conviction for hateful and threatening conduct impacting the United States. In 2010, Damache sustained a conviction in Ireland for threatening a U.S. Muslim activist. For that conviction, Damache spent just under three years in prison. In addition, a 15-year sentence would send an important message in furtherance of general deterrence. A terrorist plot – even an unsuccessful one – has ramifications that last far longer than the plot itself. The fear remains. The online postings remain. The message of empowerment to other would-be terrorists remains. For this reason, it is critical that Damache receive the statutory maximum sentence of 15 years incarceration.

This 15-year plea is further in the interest of justice because it will allow the government to conserve resources which otherwise would be spent litigating classified national security matters pursuant to the Classified Information Procedures Act, and during a lengthy complex trial.

Finally, a critical part of the proposed sentence involves the parties' Joint Motion for a Stipulated Judicial Order of Removal and the entry of a Stipulated Judicial Order of Removal, which will not only result in Damache's removal from this country without undue delay after he completes his prison sentence, but it will render him permanently inadmissible to the United States, thus protecting public safety even after Damache is released from prison.

## V.     Stipulated Judicial Order of Removal

In accordance with and in furtherance of the parties' guilty plea agreement, the parties have signed and submitted a Joint Motion for Judicial Order of Removal, a Stipulated Judicial Order of Removal, and a document entitled "Concurrence of U.S. Immigration and Customs Enforcement in Stipulated Request for Judicial Removal," signed by the Special Agent in Charge, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security. The government asks that the Court sign the Stipulated Judicial Order of Removal at the time of sentencing.

## VI. Conclusion

For the aforementioned reasons, the government submits that a sentence of 15 years incarceration, accompanied by the Stipulated Judicial Order of Removal, as agreed upon in the parties' Guilty Plea Agreement, is the appropriate sentence in this case.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney


*s/ Jennifer Arbittier Williams*
JENNIFER ARBITTIER WILLIAMS
First Assistant United States Attorney

SARAH M. WOLFE
Assistant United States Attorney


*s/ Matthew F. Blue*
MATTHEW F. BLUE
C. ALEXANDRA BOGLE
Trial Attorneys
Counterterrorism Section
U.S. Department of Justice

Dated: October 23, 2018

CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Sentencing Memorandum to be served by email upon counsel for defendant:

        Noah Gorson, Esquire
        Gorson & Gorson, P.C.
        1845 Walnut Street, Suite 1300
        Philadelphia, PA 19103

        */s Sarah M. Wolfe*
        SARAH M. WOLFE
        Assistant United States Attorney

Date: October 23, 2018